**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROGER W. KIRBY, *individually, and as sole Trustee*; THE AUGUSTUS R. A. KIRBY 2020 REVOCABLE TRUST; and THE JANE A. KIRBY 2020 REVOCABLE TRUST,<br><br>                            Plaintiffs,<br><br>        -against-<br><br>DAVID W. ZALAZNICK, *an individual*; JOHN W. "JAY" JORDAN II, *an individual*, JZ CAPITAL PARTNERS LTD., JZCP REALTY FUND, JORDAN/ZALAZNICK ADVISORS, INC., JZ 184-204 BEDFORD LLC (a/k/a RS JZ BEDFORD-N6th HOLDINGS, LLC); RED SKY JZ FULTON LLC (a/k/a RED SKY JZ FULTON HOLDINGS, LLC); RS JZ GREENPOINT LLC; JZ REIT METROPOLITAN INVESTOR, LLC; and RS JZ WYNWOOD HOLDINGS, LLC. and JOHN DOES I-XXX<br><br>                        Defendants. | No._____<br><br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

By their undersigned attorneys, plaintiffs bring this action against defendants David W. Zalaznick ("Zalaznick") and John W. "Jay" Jordan II ("Jordan) and the other entities named as defendants in the caption (herein, jointly and severally, the "Defendants").

## INTRODUCTION

1.    The indisputable facts of this case are:  in 2015 defendants Jordan and Zalaznick[1] obtained what became a massive $200,000,000 loan (the "Guggenheim Loan"). But, there was a big problem with the Guggenheim Loan:  it was illegal.  Defendants had collateralized it with the

---

[1] References to "defendants" include their own direct actions and actions taken through agents, entities they owned, controlled, or otherwise caused to take the actions complained of, as detailed by this document.

same interests that defendants already had used to obtain loans for the development of the various real estate projects in which plaintiffs had invested and were being asked to invest still more, and those *loans expressly forbade defendants from using the same collateral a second time.* Moreover, those loans expressly provided that, if defendants did use the collateral a second time, the properties would be in default. Defendants' impermissible—and insofar as plaintiffs were concerned, secret—second use of collateral to obtain the $200 million Guggenheim Loan thus caused default events across the properties in which plaintiffs had invested.  All totaled, defendants' illegal actions put over a billion dollars' worth of loan and underlying properties in default.

2.      This action arises because, on about twenty separate occasions over a period of about four years, defendants solicited and obtained funds from plaintiffs and others without bothering adequately to disclose either: (i)  the Guggenheim Loan and the collateral illegally supporting it, (ii) the underlying financial concerns that prompted the acquisition of $200 million of borrowed capital represented by the Guggenheim Loan, or (iii) that the effect of the Loan was to put into default the properties against which defendants were raising money from plaintiffs. On each occasion, defendants had a duty either to refrain from soliciting funds from plaintiffs or to disclose to plaintiffs and other investors defendants' actions with respect to the Guggenheim loan and its effect on the investments.  Defendants elected to keep their actions secret.

3.      Plaintiffs became aware of the Guggenheim Loan facilities and their significance no earlier than in or about late October /November 2019, and then only by serendipity, as detailed below.  Prior to that point, defendants had concealed the pledge and withheld facts from investors necessary to have discovered the wrong.  Defendants' capacity for stealth was such that they kept even the most sophisticated persons and entities having ongoing access to defendants, and even

2

doing due diligence, in the dark. Indeed, defendants have yet adequately to disclose publicly that they had impermissibly taken property interests and used them as collateral a second time.

4.      Defendants' actions in respect of the Guggenheim Loan and in keeping it and related information secret were reckless and fraudulent. The lies defendants told implicated the very core of the entire business ventures into which plaintiffs were being asked to invest and belied prospects for the properties whose equity had been repeatedly sold to plaintiffs and others. Ultimately, what defendants failed to disclose wiped out the greater part of investments entrusted to them by plaintiffs and other investors.

5.      Although knowledge that they were being asked to invest in projects that were in default was obviously material, and without more, would have prevented plaintiffs from making their investments, plaintiffs also invested in the projects on the justifiable belief that defendants were committed to their development.  However, defendants obtained and drew down on the illegal and otherwise impermissible Guggenheim Loan(s) because they apparently were concerned about their financial capacity to develop the various real estate projects, which caused their interest in the development of the properties to wane. It was that same lack of capital and the illegal Guggenheim Loan that had placed the properties in default that gave all leverage to the lending banks that ultimately caused the projects to go bust or sell for negligible value, in many instances obliging defendants "to turn over the keys" to the lender in exchange for forbearance from foreclosures.  As a result of defendants' wrongdoing virtually the entirety of plaintiffs' investments has been wiped out.

6.      Asked to invest in these real estate properties, plaintiffs would have considered it material, as would any reasonable investor, to have known that defendants had obtained loans that had the effect of placing the properties in default.  This would be true even if defendants had no

financial concerns, and had remained committed to development.  Plaintiffs also would have considered it material to have known that, contrary to what defendants had publicly represented, their means or commitment to develop the properties had become problematic.

7.      The aim of the action is to recover from defendants the more than $600,000 that plaintiffs invested across nearly twenty discrete transactions in defendants' real estate projects, all made after defendants had begun earnest negotiations that led to the closing of the first Guggenheim Loan in 2015, and again during April 2017 when defendants expanded the facility to $200 million. Plaintiffs' also seek punitive damages because defendants' conduct involved multiple breaches of trust and confidence over an extended period of time.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5)

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, or the failure to have provided material information, occurred in substantial part in this District.  In addition, defendants' main offices are located in this District.

11.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail and interstate telephone communications.

## THE PARTIES AND OTHER PERSONS OF INTEREST

12.     Plaintiff Roger W. Kirby is an individual residing in Dutchess County, New York. He had been, and in some instances, remains a minority investor in various real estate limited partnerships ("REIPs") ultimately controlled, directly or otherwise, by defendants Jordan and Zalaznick.  For the most part, the REIPs owned properties that were located in Brooklyn, New York. One was in Miami, Florida.  Plaintiff acquired his interests in the Jordan/Zalaznick-controlled REIP's solely for investment, and was not involved in their operations.

13.     Beginning no later than April 15, 2015, when, on information and belief, defendants were engaging in negotiations that on June 12, 2015 resulted in the closing of the initial Guggenheim Loan, and then again following defendants' expansion of the facility in 2017, defendants, operating through their agent Red Sky Capital,  initiated a series of discrete capital calls to plaintiffs without disclosure of the default-causing loan or reversal of capacity or commitment to develop the properties. In response, plaintiff Kirby made no fewer than nineteen discrete investments aggregating $429,336.72**:**

| | | |
|---|---|---|
| Fulton Mall | 5/15 | 51,861.12 |
| Greenpoint/Stiles | 8/15 | 22,755.42 |
| | 6/17 | 31,994.58 |
| | 6/18 | 9,000 |
| Miami (Design/Wynwood) | 4/15 | 125,000 |

| | 2/19 | 9360.35 |
|---|---|---|
| | 7/19 | 7968 |
| | 10/19 | 5865 |
| Roebling | 6/18 | 4450.83 |
| | 8/18 | 2077.05 |
| | 2/19 | 1770.50 |
| | 4/19 | 4932 |
| | 7/19 | 5780 |
| | 9/19 | 2630 |
| Williamsburg/Bedford N6 | 3/17 | 74,261.96 |
| | 6/18 | 27,467.85 |
| | 9/18 | 20,000 |
| | 9/18 | 7,689.06 |
| | 4/19 | 14,473 |

14.     Plaintiffs Augustus R.A. Kirby 2020 Revocable Trust and Jane A. Kirby 2020 Revocable Trusts are New York State Trusts ("Plaintiff Trusts"). Plaintiff Kirby is the sole Trustee for each.  The named beneficiaries of the Trusts are children of plaintiff Kirby.  The subject investments were made on behalf of the Plaintiff Trusts, or on behalf of predecessors in interests to those Trusts, through the vehicle of the Kirby Family Partnership, LP.  Plaintiff Trusts purchased their interests in the REIP's solely for investment, and were not involved in its operations.

15.     Beginning no later than April 15, 2015, when, on information and belief, defendants were engaging in negotiations that on June 12, 2015, resulted in the closing of the initial Guggenheim Loan, and then again following defendants' expansion of the facility in 2017, defendants initiated a series of discrete capital calls to the Plaintiff Trusts without disclosure of the

default-causing Guggenheim Loans or reversal of capacity or commitment to develop the properties. In response to the discrete capital calls, the Plaintiff Trusts made no fewer than a dozen discrete investments aggregating $186,560.80.

| | | |
|---|---|---|
| Greenpoint/Stiles | 8/15 | 5,051.70 |
| | 6/17 | 7,114.97 |
| | 6/18 | 3,719.22 |
| Miami (Design/Wynwood) | 4/15 | 75,000 |
| | 9/17 | 8250 |
| | 2/19 | 6123.99 |
| | 7/19 | 5307 |
| | 10/19 | 11,139 |
| Williamsburg/Bedford N6 | 3/17 | 32,621.39 |
| | 6/18 | 12,717.06 |
| | 9/18 | 12,819.47 |
| | 4/19 | 6,701 |

16.     On information and belief, defendant Zalaznick is a former resident and citizen of the State of New York but has now relocated to Florida or another state.

17.     Defendant Jordan is a resident and citizen of the State of Illinois

18.     Defendants Jordan and Zalaznick have their principal operational base in Manhattan at 9 West 57th Street, New York, New York 10019, where, on information and belief, may be found most of defendants' staff and documents associated with the transactions complained of.  Defendant Jordan frequently works from that address.

19.     Defendants Jordan and Zalaznick sit atop and control a network of entities that lead directly to and through the vehicles into which plaintiffs poured their funds. Together these defendants are, or at relevant times were, the largest shareholder of a publicly-traded company, JZ Capital Partners Ltd. ("JZCP"), a Guernsey domiciled closed-end investment company. During the period complained of, JZCP had no direct employees, but was dependent on its Investment Adviser. That Investment Adviser was Jordan/Zalaznick Advisers, Inc. (CRD# 160932/SEC#: 801-73940) (referred to herein as "Adviser"). The Adviser's sole beneficial owners were, at all relevant times, the very same defendants Jordan and Zalaznick, and during various years since 2015, JZCP paid Jordan, Zalaznick's wholly-owned Adviser fees that exceeded $25 million.

20.     By their wholly-owned Adviser, Jordan and Zalaznick controlled the investments at issue that ostensibly originated with JZCP, including the Guggenheim Loan(s), and the real estate investment partnerships (REIPs") at the center of this complaint.

21.     Under the direction of Jordan, Zalaznick and the Adviser, JZCP invested through wholly-owned JZCP Realty Fund, Ltd, which in turn invested through other wholly-owned or nearly wholly-owned subsidiaries (JOHN DOES I – XXX) that ultimately came to rest owning the controlling interests in the various residential, commercial, and development real estate properties and real estate limited partnerships ("REIPs") that are the focus of this action. On information and belief, relevant entities that JZCP Realty Fund, Ltd had a 100% interest in, included: JZCP Loan Metropolitan Corp, JZCP Loan 1 Corp, JZCP Loan Flatbush Portfolio Corp, JZCP Loan Flatbush Corp, JZCP Loan Fulton Corp, JZ REIT Fund Greenpoint, LLC, JZ REIT Fund Florida, LLC, JZCP Loan Florida Corp, JZCP Loan Design Corp and JZ REIT Fund Design LLC. Likewise, on information and belief, relevant entities that JZCP Realty Fund, Ltd had a 99% interest in included:

JZ REIT Fund Metropolitan, LLC, JZ REIT Fund 1, LLC, JZ REIT Fund Flatbush Portfolio, LLC, JZ REIT Fund Flatbush, LLC, JZ REIT Fund Fulton, LLC and JZCP Loan Greenpoint Corp.

22.     Defendants controlled REIPs that are the subject of this complaint and that received plaintiffs' funds, either directly or via a vehicle formed by defendants' agent Red Sky.  These Jordan/Zalaznick-controlled REIPs include JZ 184-204 Bedford LLC, amended to RS JZ Bedford-N6th Holdings, LLC; Red Sky JZ Fulton LLC, amended to Red Sky JZ Fulton Holdings, LLC; RS JZ Greenpoint LLC; JZ REIT Metropolitan Investor, LLC; and RS JZ Wynwood Holdings, LLC.

23.     "RS" in the aforementioned LLCs stands for Red Sky Capital.  Red Sky Capital is a small Brooklyn based real estate entity. Red Sky served as defendants' agent in respect of plaintiffs' investments.   As such, plaintiffs' reliance on Red Sky's authorized statements or omissions is imputed to defendants as principal.

24.     Red Sky's actions were explicitly constrained and controlled by agreements with defendants, as well as by power that defendants had arising from personal loans made to the Red Sky principals. Red Sky, and its principals, thus depended and continue to depend on Jordan and Zalaznick for funding, forgiveness of personal loans to and assistance to secure relief from certain guarantees by the Red Sky principals.   On information and belief, defendants Jordan and Zalaznick, directly or otherwise, also own a part of Red Sky.

## FACTUAL ALLEGATIONS

25.     Typically, defendants Jordan and Zalaznick would cause the creation of a property specific LLC, such as those listed at paragraph 22 above, that would serve as the property owner ("Property Owner").  For example, in the instance of the acquisition of property located at 184/204 Bedford Avenue, "RS JZ 184/204 Bedford Investors, LLC" was formed as a single-purpose entity to acquire and own the particular property at the address, and subsequent properties that may have been acquired as part of a development project. The acquisition entities were sometimes referred to by defendants and in transaction documents as the "JZ REIT," and were controlled ultimately by defendants.

26.     The "RS" in the acquisition LLC's name (e.g., RS JZ 184/204 Bedford Investors, LLC) refers to the aforementioned Red Sky Capital ("RSC" or "Red Sky") entity dominated and controlled by defendants.   As noted, in respect of the investments complained of, Red Sky acted as defendants' agent, and as such plaintiffs' reliance on Red Sky's authorized statements or omissions is imputed to defendants as principal.

27.     Typically, the particular Jordan and Zalaznick REIP that was the Property Owner (often referred to simply as the JZ REIT) funded the acquisition of the property or supported the management of the property by a combination of defendants' own funds, funds from JZCP (the publicly-traded, employee-free entity of which defendants together were the largest shareholder and sole investment adviser), by borrowing from a lender, and by raising money from investors such as plaintiffs via its agent Red Sky.  These latter investors were known as "Friends and Family" investors.   Plaintiffs were among the "Friends and Family" investors.

28.     In respect of taking money from plaintiffs and other friends and family, as Property Owner defendants Jordan and Zalaznick would authorize its agent Red Sky to sell a part (usually

about 5%) of defendants' REIP equity interests to friends and family. With defendants Jordan and

Zalaznick's authorization, Red Sky would inform potential friends and family, including plaintiffs,

that "Our investors [defendants] have allowed us to syndicate $[n] of the $[X] of equity to our

friends and family."

29.    Plaintiffs (and other similarly situated investors) who wanted to own equity in the

JZ-controlled REP would acquire that via an ostensible investment in a Red Sky LLC entity[2],

which would contemporaneously fulfill its stated purpose by folding into one of the designated JZ

REIP's listed in paragraph 22 above. Folding the investment into the JZ-controlled LLC via the

Red Sky vehicle fulfilled the first stated purpose of the Red Sky LLC agreements; namely, to

acquire an interest in the property acquired by the JZ REIP. In recognition of the reality that

plaintiffs were acquiring interests in the Jordan/Zalaznick-controlled REIP, investors wired their

investment funds directly to the bank account of the Jordan/Zalaznick-controlled REIP or to a Red

Sky account en route to or for the benefit of the particular JZ REIP and defendants Jordan and

Zalaznick. The tax information respecting plaintiffs' investments that would be provided annually

on Schedules K-1 (Form 1065) would include rents passed through from the Jordan/Zalaznick-

controlled REIP, and, on information and belief, would include the Jordan/Zalaznick-controlled

REIP's Employer Identification Number.

30.    In exchange for their funds, responding investors, including plaintiffs, would thus

in substance and effect receive equity in the designated Jordan/Zalaznick-controlled REIP listed

at paragraph 22 above via defendants' agent Red Sky. The equity interests obtained by plaintiffs

and other friends and family were carved out of the 100% interest that defendants Jordan and

Zalaznick otherwise would have had. Plaintiffs had no authority in respect of the Red Sky LLCs

---

[2] Namely, BB FF 569 Fulton LLC; BB FF Greenpoint LLC; BB FF Design 40 LLC; BB FF 143 Roebling, LLC; BB Bedford N6th, BB FF Investors LLC, all believed to be Delaware limited liability companies.

or the JZ REIP LLCs into which the Red Sky LLC was folded and were not at all involved in the operations of the entity.  Plaintiffs acquired their interests solely for investment.

31.     Whatever monies Red Sky's Friends and Families investors, including plaintiffs, invested directly benefited Jordan and Zalaznick.  They reduced more or less dollar for dollar what defendants, directly or otherwise, would have had to invest or borrow to acquire the properties or otherwise support them.  It is the funds raised via Red Sky that were invested in the JZ controlled-REIPs that are the focus of this complaint, and that plaintiffs seek to recover.

32.     When Red Sky could not fill the percentage allotted to it, defendants would retain ownership of 100% of the equity in the particular REIP, have to invest more of their own funds or try to borrow them.  Similarly, when investors did not respond to capital calls, their equity interests would be reduced ratably and defendants' equity interests would increase.

33.     In raising funds from its Friends and Family, including plaintiffs, Red Sky represented that Jordan and Zalaznick were long-term investors acquiring properties for "the opportunity to develop," or having "plans to develop," together with its agent Red Sky.  In the instance of the Bedford Avenue acquisition, for example, illustrative returns were for 5 and "7-year holds."

34.     In soliciting funds from plaintiffs for the benefit of defendants and within the scope of authority and knowledge of defendants, Red Sky representations about Jordan and Zalaznick's development commitments merely echoed Jordan and Zalaznick's representations that they were committed to the "buy and build strategy," broadcast by Jordan and Zalaznick in the JZCP Annual Reports.  For example, the first page of JZCP's Annual Report for 2018, published in or about June 2019, states that "[i]n the US, JZCP has an innovative buy-and-build strategy."   The

representation and emphasis that Jordan and Zalaznick were long-term investors and developers persisted throughout the time of the investments undergirding this complaint.

35.     The terms of the Red Sky LLC's provided that Red Sky was "Manager," but its powers were highly restricted by operating agreements between it and various Jordan/Zalaznick-controlled REIPs.

36.     Red Sky's job was "business related to [the] management of the properties." Operating agreements respecting the various properties were explicit that "business related to [the] management of the properties" confined Red Sky "to manage the day to day affairs of the entity." Red Sky was expressly prohibited from doing any "major acts" (defined) without approval of the "JZ Member."  Amendments to the operating agreements further restricted Red Sky's authority. "Making a capital call" was one of the many acts that Red Sky was explicitly prohibited from doing without approval of the JZ Member.

37.     Red Sky's annual budget required approval by the JZ Member, and the JZ Member had the power to remove Red Sky from its role as highly circumscribed manager.

38.     Another measure of Jordan and Zalaznick's dominance over Red Sky was that, through its solely-owned Adviser identified above, Jordan and Zalaznick grabbed fees from the real estate investment partnerships at points of property acquisitions.  These were not paid pursuant to any agreements at all but were simply taken by the Jordan and Zalaznick Adviser vehicle by virtue of its dominance of Red Sky.

39.     Other measures of dominance and control of Red Sky include that (i) defendants made loans of $12 million to the Red Sky principals, which would be forgiven only if the principals did their bidding; (ii) defendants forced the Red Sky principals to waive arrears owed to them and to Red Sky; (iii) defendants would continue to fund Red Sky only if it executed certain documents;

and (iv) having induced the Red Sky principals to execute tens of millions of dollars of guarantees without disclosure of the pledges that put the loans into default, defendants threatened the principals that those guarantees would be exercised against them if they did not do defendants' bidding.

## The Guggenheim Loan

40.     On information and belief, beginning no later than some time in 2015, JZCP (having no employees and admittedly dependent on the Jordan/Zalaznick Investment Advisers) began to experience financial concerns that could erode its ability to provide capital and otherwise support its commitments to support and develop properties, including the commitment to develop the REIPs that are the focus of this complaint.  Disclosing JZCP's deteriorating financial condition would have had a materially adverse impact on its stock price (as happened in Q4 2019 when problematic news related to JZCP's real estate became public; JZCP's stock price dropped precipitously)[3].  To avoid a decline in the JZCP stock price and other adverse business and financial consequences to the projects at issue and to them, Jordan and Zalaznick kept their financial concerns a secret from the investing public, from institutions interested in acquiring an interest in certain properties, from Red Sky, from lenders, and from plaintiffs.  It was at about this time that defendants embarked on a series of brazenly impermissible and unlawful actions that are at the core of this action.

41.     On information and belief, defendants opened discussions in the months preceding June 12, 2015, that ultimately led to JZCP closing on a loan facility of approximately $150 million

---

[3] https://citywireamericas.com/news/jz-capital-crumples-on-19-property-writedown-warning/a1288960?section=investment-trust-insider

from Guggenheim Partners Limited (the previously mentioned "Guggenheim Loan"). During April 2017 the Guggenheim Loan facility was increased to $200 million.

42.     To obtain these loan facilities Jordan and Zalaznick displayed their authority across and down through the entirety of their network of intermediate entities all the way to the REIPs in controversy by causing JZCP to pledge as collateral its direct and indirect interests in those REIPs. This was done although the various REIP operating and loan agreements explicitly forbade the pledge of interests in REIPs. An exemplar is the Loan Agreement entered into on September 18, 2018 in respect of the Greenpoint/Stiles property, sometimes referred to as the "Stiles Properties."

43.     On that date, September 18, 2018, Stiles Properties entered into a Loan Agreement by which Stiles Properties borrowed approximately $57.4 million. The provisions of the Loan Agreement were violated the instant the document was executed, and the ways in which those violations translated into events of default. They also are exemplar of the prohibiting provisions of the other loan agreements relating to each of the other properties in which plaintiffs were induced to invest.

44.     By way of example, section 5.2.10(b) of the Stiles Properties Loan Agreement states in part: *"Without the prior written consent of Lender and except to the extent otherwise set forth in this Section 5.2.10, Borrower shall not, and shall not permit any Restricted Party to, (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer, permit a change in control of, or dispose of (in each case, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein, directly or indirectly, at any tier of ownership, except with respect o any Transfers with respect to Leases*

*otherwise expressly permitted under this Agreement, (ii) permit a Sale or Pledge of any interest in any Restricted Party, directly or indirectly, at any tier of ownership ....*"

45.     As of September 18, 2018, by operation of the pair of Guggenheim Loan facilities collateralized by their interests in the Stiles Properties, this provision was plainly violated.

46.     Likewise, section 8.1(a)(iv) makes clear that defendants' pledge of collateral was an *"Event of Default: "(a) (iv) if Borrower Transfers or otherwise encumbers any portion of the Property or the Collateral in violation of the provisions of this Agreement....*"

47.     Section 8.1(a)(v) makes equally clear that the misrepresentations and omissions that necessarily followed from the undisclosed collateralization of defendants' pledges also were and remain events of default: *"if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made or deemed remade.*"

48.     The consequences of defendants' concealed pledges were clear and severe, even fatal:

- 5.2.10(e): *"Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer prohibited hereunder without Lender's consent.*"

- Sec. 8.1(b): *Upon the occurrence of an Event of Default [] and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Obligations to be immediately due and payable....*" (emphasis supplied).

49. Other apposite provisions of the Loan Agreement include the Agreement's definition of "Material Adverse Change."  The Agreement defines it to mean: "the business, operations, prospects, property, assets, liabilities or financial condition of any applicable Person and each of their subsidiaries, taken as a whole, or in the ability of any such Person to perform its obligations under the Loan Documents has changed in a manner which could materially and adversely impair the value of Lender's security for the Loan."

50. The pledge of JZCP's significant interests in the assets of Stiles Properties easily falls within this meaning of Material Adverse Change.

51. Similarly, section 3.1 of the Loan Agreement provides in relevant part that *"Borrower shall be fully and personally liable and subject to legal action, for any Losses arising out of or in connection with ***(i) fraud or intentional misrepresentation by or on behalf of Borrower, Mezzanine Borrower, Guarantor or any Affiliate of any of them in connection with the Loan, the Mezzanine Loan or the Property."*  Jordan and  Zalaznick's failure to report that the Borrower's assets had already been collateralized qualified as "fraud or misrepresentation.

52. Section 4.1.8 requires full and accurate disclosure from the defendants:  "*[n]o statement of fact made by or on behalf of Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower that has not been disclosed to Lender that adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property ....*"  Jordan and Zalaznick's failure to report that JZCP already had collateralized the Borrower's assets violated this obligation of Full and Accurate Disclosure.

53.     Section 5.1.5 concerns Notice of Default and obliges that "*Borrower shall promptly advise Lender of (i) any Material Adverse Change in Borrower's, Mezzanine Borrower's or Guarantor's condition, financial or otherwise, of which Borrower has knowledge, (ii) the occurrence of any default under the Management Agreement....*"   On information and belief, Jordan and Zalaznick concealed those pledges from the REIP lenders, and certainly from minority investors, including plaintiffs, in the REIPs.

54.     What Jordan and Zalaznick had done was to take the same collateral and use it to support two loans without disclosure to either lender, much less plaintiffs and Friends and Family investors.

55.     The consequences of pledging what was impermissible and what was surreptitiously pledged  a second time to support the Guggenheim Loan  instantly caused defaults by the explicit terms of the REIPs' loan agreements and jeopardized the hundreds of millions of dollars that investors had poured into those projects.

56.     The pledges equally violated the Operating Agreements respecting the various REIPs.

57.     Even if the Guggenheim Loan facilities had not been obtained because of financial concerns, plaintiffs would have been justified in finding it material to their investment decisions to have known about the pledges, and would not have invested knowing that impermissible pledges had been made and that the pledges had caused defaults by the terms of the lending and operating agreements.

58.     Intentionally misrepresenting collateral by pledging that which could not be permissibly pledged is bank fraud.  Had the defaults and the apparent fraud necessary to obtain the two Guggenheim Loan facilities become public, JZCP would have been exposed to tremendous

liabilities that its shareholders would ultimately bear.  Again, Jordan and Zalaznick did not disclose the second and impermissible pledges, either to plaintiffs or to lenders nor to plaintiffs' knowledge to JZCP investors.

59.     Meanwhile, despite the fact that defendants had set about surreptitiously putting the REIPs into default, *on no fewer than nineteen occasions* thereafter Jordan and Zalaznick continued to authorize its agent Red Sky to seek capital for initial capital and in response to capital calls from uninformed minority investors, including plaintiffs, who would have considered it material to have known of the pledges that had put the properties into default (and who would not have invested had they had that knowledge).  As set forth above, defendants Jordan and Zalaznick's express approval was required to make those capital calls.

60.     On none of the nearly twenty occasions during 2015-2019 when the capital calls upon plaintiffs were made, did defendants make disclosure of the Guggenheim Loan facilities to the minority investors, including plaintiffs.  Nor did they provide explanation of why the infusion of the $200 million of capital was needed, nor even that the JZCP interests in the REIP properties in which plaintiffs had invested had been pledged, nor that the unlawful pledges meant that the REIPS were in material default of loan agreements and of operating agreements, nor that Jordan and Zalaznick and/or JZCP were concerned that financial issues made problematic the capacity to sustain much less develop the properties owned by the REIPs in which plaintiffs had invested.  To the contrary, well after the Guggenheim Loans were made, defendants continued to tout their long-term commitment to the development of the properties: "In the US, JZCP has an innovative buy-and-build strategy."  Plaintiffs' funds were thus obtained by materially misleading statements and omissions.

61.     Information concerning the Guggenheim Loans and their connection to the JZCP interests in the subject REIPs came to light by chance in or about October/November 2019.  At that time, an adjustment in the Guggenheim Loan facilities was being sought, and Jay Parry Monge, a lawyer acting for Jordan and Zalaznick, disclosed their existence.

62.     Before then, the facts concerning the improper Guggenheim Loan facilities had been concealed beyond discovery by plaintiffs. Defendants' fraudulent concealment was so profound and effective that the pledges and associated facts were hidden from sophisticates close-to defendants and charged with due diligence.

63.     On information and belief, Red Sky, which managed the properties and worked closely for defendants, had not been aware of the Guggenheim Loan facilities or that they rested on illegal pledges of collateral that had put the properties in default.  Indeed, on or about September 18, 2018, the Red Sky principals signed as guarantors for the $57.4 million Stiles Properties Loan Agreement.  Had they been aware of the pledge, presumably they would not have guaranteed a loan that defendants' illegal pledges had put in default the instant that the Loan Agreement and their Guaranty were executed.

64.     If any single act gives insight into defendants' ruthless *scienter,* gross and aggravated misconduct, it is this:  as the two Red Sky principals were inking the guaranty making them liable for the $57.4 million loan, Jordan and Zalaznick stood by, silently, knowing that the Guggenheim Loan facilities secretly collateralized by JZCP's/defendants' interests in the Stiles Properties had put the Loan in default and made the guarantors instantly liable for $57.4 million, a sum the Red Sky principals could not afford

20

65.     Stunningly, neither directly nor through one of their controlled entities has Jordan and Zalaznick ever voluntarily disclosed to the public that the Guggenheim Loan facilities had been supported by the REIP's or that the illegal pledges had thrown the projects into default.

66.     Mention of the Guggenheim Loan facilities in the JZCP financial statements omits to disclose that interests in the subject REIPs had been pledged and that the pledges had created loan defaults.  Instead, footnotes to the JZCP annual reports merely reported and to the most recent one at least, continue to report, that certain unidentified investments "were held as collateral for the loan."  As JZCP has assets other than the REIPs in controversy, it was not even impliedly disclosed that the assets being held as collateral were those of these US REIPs.

67.     Neither JZCP in its financial disclosures nor Jordan and Zalaznick otherwise have publicly disclosed that the loans were collateralized by the Red Sky-related US REIPs, much less that the pledges were prohibited by the various loan and operating agreements and instantly caused defaults, nor that the collateral that defendants were posting for the Guggenheim Loan facilities had already been pledged to obtain loans on the properties.

68.     Defendants' misconduct in respect of the pledges, the failure to disclose them to plaintiffs and others who invested in the REIPs, and the continued solicitations and receipts of funds following the secret pledges, was willful, and, has essentially wiped out plaintiffs' investments.

69.     Knowledge that they were being asked to invest in projects that were in default was obviously material, and without more, would have prevented plaintiffs from making their investments.  The defaults and events of default created by defendants ultimately caused the destruction of plaintiffs' investments.  As a result of the defaults, defendants placed the investments in jeopardy and eliminated their ability to negotiate with the lenders to preserve the

value of the investments.  In addition plaintiffs invested in the projects on the justifiable belief that defendants were committed to their development, and enjoyed the capacity to fulfill that commitment.  However, defendants obtained and drew down on the illegal and otherwise impermissible Guggenheim Loan(s) because they apparently lacked, or at least were concerned that they lacked, the financial capacity and interest to develop the various real estate projects. Defendants' conduct caused the projects to lose all, or substantially all, of their value, and in many instances oblige defendants "to turn over the keys" to the lender in exchange for forbearance from foreclosures.  As a result of defendants' wrongdoing plaintiffs' investments have been wiped out.

70.    Defendants' agent Red Sky neither had nor now has funds to reverse plaintiffs' investments in the JZ REITs, and cannot possibly do so. Besides, in substantive reality plaintiffs' investments were in, and acquired equity of, the JZ-controlled REIPs.  Defendants properly should be obliged to reverse/rescind plaintiffs' investments.

## CAUSES OF ACTION

### FIRST CAUSE

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder

71.     Plaintiffs reallege the foregoing allegations.

72.     Each of plaintiffs' investments in the various REIP's was an investment contract and a "security" as defined the Securities Act of 1933, and by the Securities & Exchange Act of 1934. 15 USC §77b(a)(1); 15 USC §78c.

73.     Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) conceal the pledges and deceive plaintiffs; (ii)  conceal that concerns about capital jeopardized the financial capacity to support much less develop the projects; and (iii) cause plaintiffs to acquire interests in the various defendants-controlled REIPs listed above, which they would not have done had defendants disclosed the pledges, disclosed their default effect, or if defendants had disclosed that they were concerned about having the financial capacity to support or develop the projects, or were no longer interested in, committed to, or able to develop the properties.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth in this complaint.

74.     In doing so, defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs in respect of their purchasers of the various REIPs in an effort to obtain plaintiffs' funds in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged herein.

75.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the pledges as alleged herein.

76.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse information that was non-public and as a practical matter unavailable to plaintiffs, and engaged in acts, practices, and a courses of conduct as alleged herein in an effort to assure that plaintiffs would make the investment they did, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the REIPs and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the plaintiffs.

77.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to disclose facts that were entirely available to them; indeed, were created by them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the pledges and the defaults described herein, and concealing their true financial condition, thereby inducing plaintiffs to make the investments listed above, and to allow defendants to benefit thereby.

78.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, plaintiffs made the investments they did in ignorance of the pledges and defaults, and ignorant of defendants' true financial conditions, and

reasons for the Guggenheim Loan facilities, and relying directly or indirectly on defendants' false and misleading statements, or omissions of material information, plaintiffs acquired the interests in the REIPs that they did  and that have been set forth above and have been damaged thereby.

79.     At the time of said misrepresentations and/or omissions, plaintiffs were ignorant of their falsity, of the pledges, of the defaults, of the reasons for the Guggenheim Loan facilities, and of defendants' waning capacity and interest in developing the properties.  Had plaintiffs known any of these truths, they would not have purchased or otherwise acquired their interests in the REIPs listed above.

80.     By virtue of the foregoing, defendants, and each of them violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered damages of no less than $615,897.52 in connection with their acquisitions of interests in the various Property Owner LLC's.

## SECOND CAUSE

### Violation of Section 20(a) of The Exchange Act

82.     Plaintiffs reallege the foregoing allegations.

83.     Defendants acted as controlling persons of the REIPs in which plaintiffs' funds were invested and within the meaning of Section 20(a) of the Exchange Act.  Defendants had the power to influence and control and did influence and control, directly or indirectly, all the non-plaintiffs entities identified by this complaint and the communications by the JZ REIPs, including the LLCs that were the Property Owners and the communications by defendants' agent Red Sky, that resulted in the investments complained of, including the content and dissemination of the various statements and omission that plaintiffs contend were false and misleading.

Defendants had unlimited opportunities to prevent the misleading statements or to disclose that which they had omitted to disclose and concealed.

84.     The Property Owner LLCs and defendants Jordan and Zalaznick each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged by this complaint. By virtue of their position as controlling persons, defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered damages in connection with their investments that were, in substance, the acquisition of interests in the various Property Owner LLC's listed above.

### THIRD CAUSE
### Common Law Fraud / Fraudulent Omission

85.     Plaintiffs reallege the foregoing allegations.

86.     In the absence of a limiting contract provision, the term "fraud" includes both actual knowledge of a misrepresentation, the making of a misrepresentation with reckless disregard for its truth or falsity, and/or concealment.

87.     In respect of the investments at bar, (a) defendants' made false representations directly or through their agent Red Sky or omitted to make statements that would have made the statements made not misleading; (b) made those statements or suffered the material omissions with knowledge of their falsity, or with reckless indifference to their falsity; (c) had special knowledge regarding the fraudulent omissions that was not ascertainable by plaintiffs; (d) with the intention to induce plaintiffs to make the investments they made; (e) plaintiffs' investments were made in reasonable and justifiable reliance that they were not investing in properties that were in default under loan agreements, or that defendants were not able or committed to the

26

development of the properties; (f) plaintiffs' reliance damaged them in an amount no less than $615,897.52, and (g) benefitted defendants a substantially equivalent amount.

**FOURTH CAUSE**

**Breach of Fiduciary Duty**

88.     Plaintiffs reallege the foregoing allegations.

89.     Defendants had fiduciary duties to plaintiffs, which defendants breached in multiple ways.

90.     Defendants' fiduciary relationship ran directly to plaintiffs.  With the exception of the initial Miami investment, all solicitations of funds from plaintiffs were made at a time when plaintiffs and defendants were in a fiduciary relationship. Plaintiffs had ostensibly invested in a Red Sky LLC, but the funds invested did not stay with Red Sky but passed through or went directly to a JZ controlled account, and ultimately benefited defendants Jordan and Zalaznick by reducing dollar for dollar the amount that they, or an entity they controlled, had to invest or borrow for the property or to support it.  Indeed, the purpose of the nominal investment in the Red Sky LLC's was to "acquire an interest in Project [RSC JZ] LLC," and equity in the JZ REIP was the thing of value that plaintiffs received for their investments.

91.     Defendants' fiduciary relationship ran directly to plaintiffs via the principal-agency relationship between defendants and Red Sky.  Acting as defendants' authorized agent and within the scope of its authority, Red Sky pitched investments to plaintiffs and made capital calls to plaintiffs at a time when Red Sky and plaintiffs were in fiduciary relationships by virtue of the Red Sky Friends and Family LLC's.

92.     Defendants' fiduciary relationship with plaintiffs also existed derivatively via the Friends and Family's LLC's minority membership in the RS JZ REITs.

27

93.     Plaintiffs have not made a demand on the managers of Red Sky to recover their losses because the $615,897.50 of damages caused by the wrongdoing complained of are personal to plaintiffs.  They invested funds, and distributions were to be made to them, by the JZ REIT and ratably with their respective percentage interests.

94.     Paragraphs 36-39 above show that defendants also exercised their dominance and control over Red Sky, and also profited by plaintiffs' investments via defendants' solely-owned Adviser.  Jordan and Zalaznick used it to grab fees from the real estate investment partnerships at points of property acquisitions.  These fees were not paid pursuant to any agreements at all but funds were simply taken by Jordan and Zalaznick by virtue of their dominance of Red Sky.

95.     Defendants breached their fiduciary duties by their lack of candor and concealment of material information in respect of the pledges, and/or by the diminution of their commitment or ability to develop the properties, and their duty of care by putting their interests before plaintiffs by the undisclosed making of the pledges and taking down of the Guggenheim Loans in order to, *inter alia,* support the publicly-traded JZCP, of which they were together the largest shareholder.

96.     Defendants' violations of their fiduciary duties damaged plaintiffs in an amount no less than $615,897.52.

## FIFTH CAUSE

### Punitive Damages

97.     Plaintiffs reallege the foregoing allegations.

98.     Defendants' wrongdoing extended over years and involved numerous discrete instances where investments were sought from plaintiffs and other minority investors.

99.     Defendants have shown no remorse for their misconduct and continue to conceal the improper pledges in their publicly-filed documents.

100.     Defendants' misconduct thus has been, and continues to be,  gross or aggravated, and or a breach of trust or confidence.

101.     Accordingly, plaintiffs are also entitled to recover punitive damages equal to the amount that defendants improperly obtained from plaintiffs.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims for which trial by jury is available.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants jointly and severally:

A.     Awarding Plaintiffs damages, including punitive damages, as proven at trial for all injuries resulting from Defendants' unlawful, harmful, and tortious conduct as set forth herein;

B.     Rescission of the agreements whereby Plaintiffs entered into the individual investments outlined above and the return of Plaintiffs' investment funds;

C.     Awarding Plaintiffs costs and attorneys' fees for bringing this action;

D.     Awarding Plaintiffs pre-judgment and post-judgment interest; and

E.      Awarding Plaintiffs any additional relief the Court may deem just and proper.


Dated:  September 28, 2021
        New York, New York


                                        Respectfully submitted,

                                        BOIES SCHILLER FLEXNER LLP


                                         __/s/ John T. Zach_____
                                        By:  John T. Zach